UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY GEROME YOUNG,<br><br>Plaintiff,<br><br>v.<br><br>MUHAMMAD QURESHI, et al.,<br><br>Defendants. | No. 2: 15-cv-2674 JAM KJN P<br><br><br>FINDINGS AND RECOMMENDATIONS |

I.  Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF No. 44.)  For the reasons stated herein, the undersigned recommends that defendants' summary judgment motion, as it related to plaintiff's claim for damages, be denied.

II.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

////

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).

"Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on February 1, 2017 (ECF No. 14), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

////

1   III.  Plaintiff's Claims

2       This action proceeds on the amended complaint filed February 16, 2016 as to defendants

3   Abu, Atienza, Clark, Qureshi, Singh and Ybarra. (ECF No. 5.) As discussed herein, defendant

4   Clark has not been served.

5       Plaintiff alleges that after his arrival at the California Health Care Facility ("CHCF") on

6   August 26, 2013, he was assigned to High Acuity, aka the Correctional Treatment Center

7   ("CTC") due to serious medical problems and his need for a high level of medical care. (Id. at 4.)

8   On September 26, 2015, plaintiff was transferred to Low Acuity. (Id.)

9       While in High Acuity, plaintiff was prescribed medication including Lisinopril,

10   Hydralazine and Morphine. (Id.) For the approximately two years he was housed in High

11   Acuity, medical providers took his blood pressure before issuing Lisinopril and Hydralazine. (Id.

12   at 5.) During this time, medical providers in High Acuity also took his pulse before issuing

13   Morphine, because plaintiff had been diagnosed with a low heart rate. (Id.) Plaintiff alleges that

14   the medical providers who took his blood pressure and pulse worked "under" defendant Dr.

15   Qureshi. (Id. at 4-5.)

16       Plaintiff alleges that "in Low Acuity, as in High Acuity, CHCF physicians and pharmacy

17   instruct Lisinopril" should be "held" if the systolic blood measure measurement is below 100, and

18   that Hydralazine should be "held" if the systolic blood pressure measurement is below 110. (Id.

19   at 5.) Plaintiff alleges that while he was housed in Low Acuity, defendants Abu, Ybarra and

20   Atienza refused to check his blood pressure and pulse before he took Lisinopril, Hydralazine and

21   Morphine. (Id.)

22       Plaintiff alleges that when defendant Qureshi discharged him to Low Acuity, he failed to

23   properly document the requirement that plaintiff's blood pressure and pulse be checked before he

24   took his medication. (Id. at 11.) Plaintiff alleges that defendant Qureshi also failed to ensure that

25   plaintiff's need for blood pressure and pulse checks could be met in Low Acuity. (Id.)

26       Plaintiff alleges that on November 19, 2015, he wrote a letter to defendant Singh, the High

27   Acuity and Low Acuity Chief Physician, requesting that his blood pressure and pulse be

28   measured before he received his medication. (Id. at 5-6.) Plaintiff alleges that defendant Singh

failed to respond to his letter.  (Id. at 6.)

Plaintiff alleges that on October 3, 2015 and October 11, 2015, he filed CDCR 7362 forms informing defendants that on the day he was admitted to Low Acuity, his medical bed was broken.  (Id. at 6.)  Plaintiff alleges that he woke up nightly choking on his own saliva from GERD/antral gastritis, a condition which required his head to be elevated while he slept.  (Id.)  Plaintiff alleges that this condition was controlled in High Acuity with the proper bed and medication.  (Id.)

Plaintiff alleges that he informed defendants Abu and Atienza several times about his broken bed.  (Id.)  Plaintiff alleges that he was forced to endure "inflammation" for 42 days until he went on a hunger strike.  (Id.)

Plaintiff alleges that in his effort to get the serious medical treatment he needed, he wrote defendant Ybarra, the Nursing Supervisor of his unit.  (Id. at 7.)  Plaintiff alleges that defendant Ybarra did not respond to his written request or otherwise address his serious medical concerns, including his request to have his blood pressure and pulse checked before taking his medication. (Id.)  Plaintiff alleges that defendant Ybarra sent him an unsigned Health Care Services document stating, "Subject:  CDCR Form Return."  (Id.)

IV.  Plaintiff's Request for Relief

In the amended complaint, plaintiff seeks injunctive relief only.  (Id. at 8-11.)  Defendants move for summary judgment as to the merits of plaintiff's claims, although they do not address plaintiff's request for relief.

All defendants are located at CHCF.  Plaintiff is now housed at the California Medical Facility ("CMF").  (ECF No. 48.)  Thus, plaintiff seeks injunctive relief against individuals who are not named as defendants in this action, i.e., officials at CMF.  This court is unable to issue an order against individuals who are not parties to a suit pending before it.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 112 (1969).  On November 29, 2018, the undersigned ordered plaintiff to show cause why this action should not be dismissed as moot.  (ECF No. 52.)

In his response to the order to show cause, plaintiff states that he always sought damages in this action.  (ECF No. 53 at 2.)  Plaintiff states that he sought money damages in his related

5

administrative grievance.  (See id. at 6 (response to plaintiff's third level grievance stating that plaintiff requested money damages).)

Although plaintiff's amended complaint does not explicitly request money damages, the undersigned construes the amended complaint as seeking money damages based on plaintiff's response to the order to show cause.  See Chabot v. Chabot, 2011 WL 5520927, at *5 (D. Idaho Nov. 14, 2011) ("But a prayer for relief does not necessarily limit the nature or scope of relief a trial court may grant.  Plaintiffs are entitled to whatever relief is appropriate to the claims alleged in the compliant and proved."); see Fed. R. Civ. P. 54(c) (providing that non-default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); see also Z Channel, Ltd. v. Home Box Office, Inc., 931 F.2d 1338, 1341 (9th Cir. 1991) (reversing summary judgment and noting that plaintiff may be entitled to damages even though the complaint seeks only injunctive and declaratory relief); Brown v. Justus, 2013 WL 6230016, at *2 (S.D. Ill. Dec. 2, 2013) ("Although the complaint contains no prayer for relief, as required by Federal Rule of Civil Procedure 8(a)(3), the Court will construe the pro se pleading as requesting all relief available under Section 1983.")

Accordingly, plaintiff's request for injunctive relief should be dismissed as moot.  The undersigned herein addresses the merits of defendants' summary judgment motion as to the request for damages.

V.  Undisputed Facts

Plaintiff was incarcerated at CHCF from August of 2013 until May of 2017.  (ECF No. 44-2 at 2 (defendants' statement of undisputed facts); ECF No. 50 at 19 (plaintiff's response to defendants' statement of undisputed facts).)

During his incarceration within the California Department of Corrections and Rehabilitation ("CDCR"), plaintiff has been diagnosed with and treated for various medical conditions, including hypertension, low heart rate and ankylosing spondylitis (arthritis of the spine).  (ECF No. 44-2 at 2; ECF No. 50 at 19.)

Plaintiff was housed in the "High Acuity" section of CHCF from August 2013 until September of 2015.  (ECF No. 44-2 at 2; ECF No. 50 at 19-20.)  Defendant Qureshi was

plaintiff's primary care provider from July of 2014 through September of 2015.[1]  (ECF No. 44-2 at 2; ECF No. 50 at 19-20).  During that time, defendant Qureshi believed that the High Acuity setting was appropriate for management of plaintiff's medical conditions, including various heart conditions.  (ECF No. 44-2 at 2; ECF No. 50 at 19-20.)

On October 3, 2014, plaintiff was examined by outside cardiologist Dr. Ramesh Dharawat to address his history of hypertension and bradycardia (slow heart rate).[2]  (ECF No. 44-2 at 2; ECF No. 50 at 20.)  On that day, plaintiff did not complain of dizziness or fainting.  (ECF No. 44-2 at 2; ECF No. 50 at 20.)  Dr. Dharawat recommended that plaintiff be started on the medication Hydralazine, which was expected to control plaintiff's blood pressure and increase his heart rate.  (ECF No. 44-2 at 2; ECF No. 50 at 2.)

On January 16, 2015, plaintiff attended a follow up appointment with Dr. Dharawat.  (ECF No. 44-2 at 2; ECF No. 50 at 20.)  Dr. Dharawat noted that plaintiff's heart rate had improved and that plaintiff would only require follow up as necessary.  (ECF No. 44-2 at 2; ECF No. 50 at 20.)

While plaintiff was in High Acuity, his heart rate and blood pressure would be checked every day before the administration of "certain medications."  (ECF No. 44-2 at 2; ECF No. 50 at 20.)

Dr. Qureshi regularly examined plaintiff while he was in High Acuity.  (ECF No. 44-2 at 2; ECF No. 50 at 20-21.)

On September 26, 2015, plaintiff was transferred to Low Acuity. (ECF No. 44-2 at 2; ECF No. 50 at 23.)

---

[1]  In his response to defendants' statement of undisputed facts, plaintiff alleges that defendant Qureshi may have been his primary care provider past September of 2015.  (ECF No. 50 at 20.)

[2]  In the statement of undisputed facts, defendants describe bradycardia as "slow heart rate," as discussed by defendant Qureshi in his declaration.  (See ECF No. 44-5 at 2 (Qureshi declaration).)  In his response to defendants' statement of undisputed facts, plaintiff alleges that he had a history of a low heart rate rather than a slow heart rate.  (ECF No. 50 at 20.)  While it appears to be a dispute of semantics, plaintiff has provided no expert evidence to support his description of his heart ailment as involving a "low" rather than "slow" heart rate.  For this reason, the undersigned adopts the description of plaintiff's heart ailment as involving a slow heart rate, as described by defendant Qureshi, acting as an expert witness on his own behalf.

When plaintiff transferred to Low Acuity, he complained that he was no longer receiving adequate medical care. (ECF No. 44-2 at 3; ECF No. 50 at 24.) Plaintiff complained that staff refused to take his vital signs before administering certain medications. (ECF No. 44-2 at 3; ECF No. 50 at 24.)

After plaintiff was transferred to Low Acuity, he complained that his medical bed was not functioning properly, in that he was not able to raise the head of the bed. (ECF No. 44-2 at 3; ECF No. 50 at 25.) By that time, plaintiff was no longer diagnosed with Barrett's esophagus. (ECF No. 44-2 at 3; ECF No. 50 at 25-26.) Plaintiff still had gastritis, although the parties dispute whether the gastritis was mild. (ECF No. 44-2 at 3; ECF No. 50 at 26.)

On November 3, 2013, defendant Abu interviewed plaintiff. (ECF No. 44-2 at 3; ECF No. 50 at 26.) Defendant Abu and plaintiff discussed the broken bed during this interview. (ECF No. 44-2 at 3; ECF No. 50 at 6.)

On November 7, 2015, plaintiff declared that he was going on a hunger strike until a new bed was provided. (ECF No. 44-2 at 3; ECF No. 50 at 26-27.) Defendant Ybarra was advised of plaintiff's request for a new bed. (ECF No. 44-2 at 3; ECF No. 50 at 26-27.) Plaintiff received a bed in working order later in the day on November 7, 2015. (ECF No. 44-2 at 3; ECF No. 50 at 26-27.)

Plaintiff claims that defendant Ybarra was responsible for his care because she supervised defendant Atienza and other staff members. (ECF No. 44-2 at 3; ECF No. 50 at 27.)

VI. <u>Legal Standard for Claim Alleging Violation of Eighth Amendment Right to Adequate Medical Care</u>

"Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).

The two-part test for deliberate indifference requires the plaintiff to show (1) "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) "the defendant's

8

response to that need was deliberately indifferent." Jett, 439 F.3d at 1096 (internal citations and quotations omitted). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Jett, 439 F.3d at 1096 (citing McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In order to state a claim for violation of the Eighth Amendment, a plaintiff must allege sufficient facts to support a claim that the named defendants "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health ...." Farmer v. Brennan, 511 U.S. 825, 837 (1994). However, negligence in diagnosing or treating a medical condition does not give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

VII. Discussion

A. Claims Regarding Monitoring of Blood Pressure and Pulse Following Plaintiff's Transfer to Low Acuity

Plaintiff alleges that when defendant Qureshi discharged him to Low Acuity, he failed to properly document the requirement that plaintiff's blood pressure and pulse be checked before he took Lisinopril, Hydralazine and Morphine medication. Plaintiff also alleges that defendant Qureshi failed to ensure that plaintiff's need for blood pressure and pulse checks could be met in Low Acuity. Plaintiff alleges that defendants Abu, Ybarra and Atienza refused to measure his blood pressure and pulse before he took his medication. Finally, plaintiff alleges that he wrote a letter to defendant Singh requesting that his blood pressure and pulse be measured before he took his medication.

////

9

1    1. <u>Defendant Qureshi</u>

2        Defendants argue that defendant Qureshi properly concluded that plaintiff's conditions

3    were stable and no longer required the High Acuity level of care.  Defendants argue that

4    plaintiff's conditions were monitored and treated in Low Acuity without any substantial

5    complication.

6        *Were Plaintiff's Pulse and Blood Pressure Required to be Taken Before He Took His*

7    *Medication?*

8        Defendants appear to argue that plaintiff's transfer to Low Acuity was medically

9    appropriate because plaintiff no longer needed to have his pulse and blood pressure taken before

10   he took his medication.  In support of these arguments, defendants rely on defendant Qureshi's

11   declaration which states, in relevant part,

12           6.  While Mr. Young was in high acuity, his heart rate and blood
13           pressure could be checked every day before the administration of
             certain medications.

14           7.  I regularly examined Mr. Young while he was in high acuity.
             Notably, Mr. Young regularly refused to permit his vital signs to be
15           checked for several months before he was transferred to low acuity.
             During this time, Mr. Young's heart conditions were managed
16           without incident.

17           8.  On September 26, 2015, Mr. Young was transferred to "low
             acuity."  At that time, I believed that Mr. Young's medical conditions
18           no longer required the high acuity level of care and attention and
             could be properly managed in a low acuity setting.
19
             9.  At the low acuity level of care, it was no longer deemed necessary
20           to check Mr. Young's heart rate and blood pressure every day before
             administering his medications.   Mr. Young was given these
21           medications in 30-day doses, and permitted to take them on his own
             every day.
22
             10.  I was not directly involved with Mr. Young's treatment after he
23           was transferred to low acuity in September of 2015.

24   (ECF No. 44-5 at 2-3.)

25       Attached to plaintiff's opposition are medical records indicating that following his transfer

26   to Low Acuity, plaintiff's blood pressure and pulse were to be taken before he took his

27   medications.  Plaintiff has attached a form titled "Medication Reconciliation," dated September

28   26, 2015, i.e., the day he transferred to Low Acuity.  (ECF No. 50 at 44.)  The top of the form

contains a handwritten note stating, "New … Transfer fr D Yard." (Id.)  This form contains another handwritten note, near the bottom of the form, which appears to be dated September 26, 2015, stating that plaintiff should receive morphine, but to "hold if HR < 60." (Id.)  This form, which is difficult to read, also states that plaintiff was prescribed Lisinopril, and also contains a "hold" notation, but the undersigned cannot read the circumstances under which this medication is to be held.  (Id.)

Plaintiff has also attached a medication reconciliation form describing "active medications as of 12/2/2015." (Id. at 52.)  This form states that plaintiff was prescribed Hydralazine, with a start date of October 19, 2015.  (Id.)  The form contains the notation, "hold for SBP < 110," next to Hydralazine.  (Id.)  The form states that the Hydralazine was "kop," i.e., keep on person.  The next page of this form states that plaintiff was prescribed Lisinopril, with a start date of October 19, 2015.  (Id. at 53.)  The form contains the notation, "hold for SBP <100," next to Lisinopril. (Id.)  The form states that the Lisinopril was "kop."  (Id.)

The notes directing that plaintiff's medication be "held" appear to mean that plaintiff should not take these medications if his heart rate or blood pressure fell below certain levels. Thus, these records suggest that, following his transfer to Low Acuity, plaintiff's heart rate and blood pressure were still required to be taken before he took these medications.  Defendants do not address these records.  The undersigned is also puzzled by defendant Qureshi's suggestion that plaintiff was given morphine to take on his own, i.e., "keep on person."

Based on the records discussed above, the undersigned finds that whether plaintiff was required to have his blood pressure and pulse checked before he took Morphine, Lisinopril and Hydralazine after his transfer to Low Acuity, is a disputed material fact.  It is also unclear from defendants' evidence whether prison staff in Low Acuity were able to check plaintiff's heart and blood pressure before he took his medication, i.e, it is not clear whether this type of care was available in Low Acuity.

////

////

////

For the reasons discussed above, defendant Qureshi should not be granted summary judgment based on his argument that plaintiff no longer needed to have his blood pressure and pulse checked before he took his medication.[3]

*Did Plaintiff Suffer Any Injury as Result of Not Having his Pulse and Blood Pressure Measured Before He Took His Medication?*

Defendants argue that defendant Qureshi should be granted summary judgment because there is no evidence that plaintiff suffered any harm following his transfer to Low Acuity.  See Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin, 974 F.2d at 1059–60) (setting forth elements for a deliberate indifference claim, including "a serious medical need," deliberate indifference to that need, and "harm caused by the indifference").  Defendants argue that plaintiff's conditions were monitored and treated in Low Acuity without substantial complication.

In support of the argument that plaintiff suffered no harm following his transfer to Low Acuity, defendant Singh, the Chief Physician and Surgeon at CHCF, states that he reviewed the medical records "for the relevant period of time from Mr. Young's medical records.  A selection of the records upon which I have relied is attached hereto as Exhibit A."  (ECF No. 44-6 at 2.) Defendant Singh states that after reviewing plaintiff's medical records from the relevant time period, "it appears that [plaintiff's] medical needs were properly managed without incident while he was housed in low acuity."  (Id. at 2.)  The latest medical record attached to defendant Singh's declaration is December 2015.  (ECF No. 44-6 at 4-21.)

Defendants also cite the declaration of defendant Abu who states that in preparing his declaration, he reviewed the medical records for the relevant period of time from plaintiff's medical records.  (ECF No. 44-4 at 1.)  Defendant Abu states that he regularly examined plaintiff while he was in Low Acuity.  (Id. at 2.)  Defendant Abu states that as reflected in the medical

---

[3]   The undersigned observes that in his opposition, plaintiff alleges that he suffers from a "well known germ phobia," and sometimes refused to allow his blood pressure to be taken because he did not want contaminated items touching him.  (ECF No. 50 at 8-10.)  The undersigned does not need to reach the issue of why plaintiff refused to allow his blood pressure to be taken in considering defendants' summary judgment motion.

12

records, he obtained and recorded plaintiff's vital signs during essentially every examination. (Id.) Defendant Abu states that plaintiff's blood pressure regularly measured well above the required minimum for the administration of his medications. (Id.) In his declaration, defendant Abu does not discuss whether he took plaintiff's pulse.

The latest of plaintiff's medical records attached to defendant Abu's declaration is December 31, 2015. (ECF No. 44-4 at 6-40.) The latest of plaintiff's medical records attached to defendant Qureshi's declaration is September 2015. (ECF No. 44-5 at 4-52.)

In the amended complaint filed February 15, 2016, plaintiff alleged that defendants failed to measure his pulse and blood pressure before he took his medications following his transfer to Low Acuity on September 26, 2015. In the amended complaint, plaintiff requested that defendants be ordered to measure his pulse and blood pressure before he took his medications. In other words, plaintiff claimed that the alleged deprivations were ongoing. It is undisputed that plaintiff transferred away from Low Acuity in May 2017.

A complaint must state enough to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Plaintiff's amended complaint gave defendants fair notice that he was complaining about an ongoing deprivation., i.e., defendants' alleged failure to measure his pulse and blood pressure before giving him his medications. See Zean v. Wells Fargo Bank, N.A., 2018 WL 6326413 at *3 (D. Minn. 2018) ("Plaintiffs allege that these instances of wrongdoing are ongoing, and notice pleading does not require a plaintiff to amend the complaint each time a defendant allegedly commits an additional similar action.").

Defendants have provided no evidence regarding whether plaintiff suffered any harm as a result of not having his pulse and blood pressure checked from December 31, 2015 until May 2017, when plaintiff transferred away from Low Acuity. While defendant Singh states that he reviewed plaintiff's medical records for the "relevant time period," in support of his opinion that plaintiff's medical needs were properly managed, defendant Singh does not define the "relevant time period." Defendants' evidence suggests that they did not consider evidence beyond December 31, 2015. In other words, defendant Singh's opinion that plaintiff's medical needs

were "properly managed without incident" apparently is based on his review of plaintiff's medical records from September 26, 2015 through December 31, 2015.

Because defendants did not address the entire relevant time period of this claim, the undersigned finds that they have not met their initial summary judgment burden. For this reason, defendant Qureshi's summary judgment motion on the grounds that plaintiff suffered no harm as a result of not having his pulse and blood pressure checked before he took his medication should be denied.

### 2. Abu, Ybarra and Atienza

Plaintiff alleges that defendants Abu, Ybarra and Atienza refused to measure his blood pressure and pulse before he took his medication following his transfer to Low Acuity.

Defendants argue that defendants Abu, Ybarra and Atienza should be granted summary judgment because 1) plaintiff's claim that these defendants should have measured his pulse and blood pressure before he took his medications amounts to a disagreement with defendant Qureshi that such monitoring was no longer required; and 2) plaintiff's vital signs were regularly measured following his transfer to Low Acuity

As discussed above, whether it was medically necessary for plaintiff to have his blood pressure and pulse measured before he took his medications is a materially disputed fact. Accordingly, defendants Abu, Ybarra and Atienza should not be granted summary judgment on the grounds that plaintiff's request for his blood pressure and pulse to be measured before he took his medications amounts to a disagreement with defendant Qureshi.

The undersigned construes defendants' argument that plaintiff's vital signs were taken regularly following his transfer to Low Acuity to mean that plaintiff suffered no harm because of not having these measurements taken before he took his medications. As discussed above, defendants have not provided plaintiff's medical records, or an expert opinion, for beyond December 31, 2015. For this reason, the undersigned finds that defendants have not met their initial summary judgment burden as to this argument because they did not address the entire relevant time period.

////

1    For the reasons discussed above, the undersigned recommends that defendants Abu,

2 Ybarra and Atienza be denied summary judgment as to this claim.

3    3. Defendant Singh

4    Plaintiff alleges that he wrote a letter to defendant Singh requesting that his blood pressure

5 and pulse be measured before he took his medication.  Defendants move for summary judgment

6 as this claim on the following grounds:  1) it is not clear that defendant Singh ever received

7 plaintiff's letter; and 2) plaintiff's disagreement with defendant Singh's opinion that his transfer

8 to Low Acuity was appropriate does not amount to deliberate indifference.

9    Defendant Singh is not entitled to summary judgment on grounds that it is not clear

10 whether he received plaintiff's letter.  See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)

11 (plaintiff entitled to inference at summary judgment stage that defendant received the letter he

12 swore he sent him).

13    As discussed above, whether plaintiff should have had his pulse and blood pressure

14 measured before he took his medication is a disputed fact.  Defendants also failed to address the

15 entire, relevant time period as to plaintiff's claim that he should have had these measurements

16 taken.  For these reasons, defendant Singh should not be granted summary judgment on the

17 grounds that plaintiff has alleged only a difference of opinion regarding whether his blood

18 pressure and pulse should have been measured before he took his medication.

19    For the reasons discussed above, defendant Singh should be denied summary judgment as

20 to this claim.

21    B. Claim Regarding Alleged Broken Bed

22    In essence, plaintiff alleges that defendants Ybarra, Abu and Atienza did not promptly

23 provide him with a medical bed in working order.  Plaintiff alleges that when he arrived in Low

24 Acuity, the medical bed in his cell did not work.  Plaintiff alleges that he did not receive a

25 working medical bed until 42 days later, after he went on a hunger strike.  Plaintiff alleges that he

26 required a medical bed, that elevated his head, because he woke up at night choking on his own

27 saliva due to gastritis.

28 ////

1    Defendants move for summary judgment on two grounds.  First, defendants argue that

2    plaintiff did not have a serious medical need because the failure to provide him with a medical

3    bed did not put him at risk of significant injury or the wanton infliction of pain.  Second,

4    defendants argue that they did not act with deliberate indifference to plaintiff's request for a

5    working medical bed.

6        1.  Serious Medical Need

7        As discussed above, a serious medical need exists if the failure to treat the condition could

8    result in further significant injury or the unnecessary and wanton infliction of pain.  Jett, 439 F.3d

9    at 1096.

10       Defendants argue that plaintiff did not have a serious medical need because the failure to

11   provide him with a medical bed did not put plaintiff at serious risk of harm.  In support of this

12   argument, defendants cite the declaration of defendant Qureshi who states, in relevant part,

> I am informed that Mr. Young complained that his medical bed was
> not functioning properly, in that Mr. Young was not able to raise the
> head of the bed.  By that time, Mr. Young was no longer diagnosed
> with Barrett's esophagus, only mild gastritis.  Thus, in my opinion,
> the broken hospital bed did not place Mr. Young in any serious risk,
> and did not constitute a serious medical need.

17   (ECF No. 44-5 at 3.)

18       According to defendant Qureshi, plaintiff no longer required the medical bed because he

19   no longer had Barrett's esophagus.  According to Dr. Qureshi, someone with mild gastritis did not

20   require a medical bed.

21       In his opposition, plaintiff has presented no expert evidence that his medical condition

22   required that he be provided with a medical bed.  Despite this lack of expert evidence, for the

23   reasons stated herein, the undersigned finds that whether defendants' failure to timely provide

24   plaintiff with a medical bed put plaintiff at risk of serious harm is a disputed fact.

25       In his opposition, plaintiff does not dispute that he no longer had Barrett's esophagus.

26   (ECF No. 50 at 25-26.)  Plaintiff denies that he suffered only "mild gastritis."  (Id. at 26.)

27   However, the undersigned observes that all the medical records attached to plaintiff's opposition,

28   during the relevant time period state that plaintiff had mild gastritis, as does defendant Qureshi in

16

his declaration. Accordingly, for purposes of this summary judgment motion, the undersigned finds that plaintiff had mild gastritis during the relevant time period.

In the verified amended complaint, plaintiff alleges that prior to being discharged from High Acuity, he had a "proper bed." (ECF No. 5 at 6.) Attached to plaintiff's opposition are medical records showing that plaintiff had a diagnosis of mild gastritis, and not Barrett's esophagus, for at least six months prior to his transfer to Low Acuity. (See ECF No. 50 at 36 (9/1/15 record); id. at 120 (12/10/14 record).) In other words, plaintiff has presented evidence that he was provided with a medical bed in High Acuity with a diagnosis of mild gastritis. Defendants do not appear to dispute plaintiff's claim that the Low Acuity cell plaintiff moved into had a medical bed, although it was broken. It is also undisputed that plaintiff received a working medical bed on November 7, 2015.

In the verified amended complaint and in his verified declaration submitted in support of the opposition, plaintiff alleges that without a working medical bed, he woke up nightly choking on his saliva. (ECF No. 5 at 6; ECF No. 50 at 31.) Plaintiff also alleges that he was afraid to go to sleep. (ECF No. 50 at 31.) Defendants do not address these claims.

Plaintiff's allegations are sufficient to create a material dispute regarding whether his failure to be provided with a medical bed put him at risk of serious harm. Without further explanation from defendants regarding why plaintiff had a medical bed prior to and after his transfer to Low Acuity, while he had a diagnosis of mild gastritis, as well as further explanation of plaintiff's claim that he woke up choking while his bed was broken, the undersigned cannot find that plaintiff did not have a serious medical need for a medical bed. Accordingly, defendants are not entitled to summary judgment on grounds that plaintiff did not have a serious medical need.

2. Deliberate Indifference

*Defendant Abu*

In the amended complaint, plaintiff alleges that he filed CDCR 7262 forms on October 3, 2015 and October 11, 2015 "informing defendants" that his bed was broken. (ECF No. 5 at 6.) Plaintiff alleges that although he informed defendants Abu and Atienza several times about the

broken bed, it was not fixed.  (Id.)  Plaintiff alleges that on one occasion, defendant Abu asked defendant Atienza to check to see if the bed was broken.  (Id. at 6-7.)  After defendant Atienza reported back that the bed was broken, defendant Abu ordered tests for chicken pox and hepatitis.  (Id. at 7.)

Defendants argue that defendant Abu did not act with deliberate indifference to plaintiff's request for a working medical bed for the following reasons.  Defendant argue that defendant Abu was first made aware of plaintiff's complaint regarding the bed in the Health Care Appeal plaintiff filed on October 23, 2015.  Defendants argue that defendant Abu examined plaintiff on November 3, 2015 and requested that the bed be repaired or placed as soon as possible.  It is undisputed that plaintiff received a new bed on November 7, 2015.  In support of these arguments, defendants cite defendant Abu's declaration which states, in relevant part,

> 8.  It appears that Mr. Young first expressed his complaint [regarding the broken bed] in Health Care Appeal No. HC15004306, which was submitted on October 23, 2015.
>
> 9.  I examined Mr. Young on November 3, 2015, at which time he addressed the Health Care Appeal, including his complaint that his medical bed was not functioning properly.  As indicated in my notes, I requested that his bed be repaired or replaced "ASAP."
>
> 10.  On November 7, 2015, Mr. Young apparently declared that he was going on a hunger strike until a new bed was provided.  The progress notes indicate that Nurse Ybarra was advised. The notes further indicate that Mr. Young received a bed in working order later in the day on November 7, 2015.

(ECF No. 44-4 at 2.)

Attached to defendant Abu's declaration are the records from his November 3, 2015 examination of plaintiff.  (Id. at 20-22.)  These notes state that defendant Abu addressed plaintiff's appeal no. HC15004306 at the November 3, 2015 exam.  (Id. at 20.)  The notes state that defendant Abu requested that plaintiff's bed be fixed or replaced "ASAP."  (Id. at 21.)

Defendant Abu did not act with deliberate indifference on November 3, 2015 by ordering plaintiff's bed repaired or replaced "ASAP."  However, for the reasons stated herein, defendants have not met their burden of demonstrating that defendant Abu did not have knowledge of plaintiff's broken bed prior to November 3, 2015, as alleged by plaintiff in his complaint.

In his declaration, defendant Abu states, "It appear that Mr. Young first expressed his complaint in Health Care Appeal No. 15004306, which was submitted on October 23, 2015." It is unclear whether defendant Abu is claiming that Health Care Appeal No. 15004306 was plaintiff's first written complaint regarding his broken bed, or whether defendant Abu is claiming that Health Care Appeal No. 15004306 was plaintiff's first complaint ever, either written or oral, regarding the broken bed. It is also not unclear whether defendant Abu is claiming that this grievance was plaintiff's first complaint to defendant Abu only. It is also unclear as to what defendant Abu means by "it appears" that this was plaintiff's first complaint. Did defendant Abu review all of plaintiff's written grievances before making this statement?

Because of the lack of clarity in defendant Abu's declaration regarding when plaintiff made his first complaint regarding the broken bed, the form in which the complaint was made, and to whom, the undersigned finds that defendants have not met their initial summary judgment burden as to defendant Abu regarding deliberate indifference.[4] Defendant Abu should be denied summary judgment.

*Defendant Atienza*

Defendants argue that defendant Atienza should be granted summary judgment as to this claim on the following grounds:

---

[4]  In his verified amended complaint, plaintiff alleges that he submitted CDCR 7362 forms on October 3, 2015 and October 11, 2015 informing defendants that his bed was broken. (ECF No. 5 at 6.) The undersigned cannot locate the October 3, 2015 form in plaintiff's exhibits. However, a copy of this form appears to be attached to defendant Singh's declaration. (ECF No. 44-6 at 19.) In this grievance, plaintiff complains about pain, but does not mention his broken bed. (Id.) However, the October 11, 2015 request states,

> I was discharged from CTC to OHU two weeks ago. I have yet to be seen/admitted per policy; my pain and complaints of pain isn't being addressed. I was forced to move into a cell where the bed is broken, where my locker was taken against medical policy and I have to stand up to flush the toilet.

(ECF 50 at 250.)

The form states that Nurse Meadows referred this grievance to plaintiff's "PCP," i.e., primary care provider, who appears to have been defendant Abu. (Id)

Thus, plaintiff raised the issue of his broken bed in a written grievance before filing Health Care Appeal No. 15004306.

Plaintiff's claim that Nurse Atienza failed to respond to complaints that plaintiff's medical bed was not working are not supported by the evidence. Again, plaintiff was no longer diagnosed with Barret's Esophogus at that time, and the alleged need to raise the head of plaintiff's bed did not constitute a serious medical need. (UMF 13.) In any event, the records demonstrate that the complaint was resolved shortly after plaintiff submitted the Health Care Appeal.

(ECF No. 44 at 12.)

Defendants first argue that defendant Atienza is entitled to summary judgment because plaintiff did not have a serious medical need requiring that he be provided with a medical bed. As discussed above, whether plaintiff had a serious medical need requiring that he be provided with a medical bed is disputed. Accordingly, defendant Atienza is not entitled to summary judgment on these grounds.

Defendants next argue that defendant Atienza is entitled to summary judgment because plaintiff received his medical bed shortly after submitting his grievance, in apparent reference to Health Care Appeal No. 15004306 discussed in defendant Abu's declaration.[5] However, as discussed above, it is not clear from defendant Abu's declaration whether Health Care Appeal No. 15004306 was plaintiff's first written complaint, or whether there were other occasions plaintiff made verbal complaints. In addition, defendant Abu does not state whether Health Care Appeal No. 15004306 was the first complaint plaintiff made to anyone, or whether this was the first complaint made to defendant Abu. It is unclear how defendant Abu would have knowledge regarding whether plaintiff had previously complained about the broken bed to defendant Atienza, as alleged in the complaint.

Defendants have provided no evidence addressing plaintiff's claim that defendant Atienza ignored his complaints regarding the broken bed. For that reason, defendants have not met their initial summary judgment burden of demonstrating that defendant Atienza did not act with deliberate indifference. Accordingly, defendant Atienza should be denied summary judgment as to this claim.

////

---

[5] Defendant Atienza does not address plaintiff's claim that she failed to respond to his complaints regarding his broken bed in her declaration. (ECF No. 44-8.)

*Defendant Ybarra*

Plaintiff alleges that he wrote defendant Ybarra about his serious medical needs. (ECF No. 5 at 7.) Plaintiff alleges that defendant Ybarra responded by sending him an unsigned Health Care Services Document with the words: "Subject: CDCR 22 Form Return." (Id.) Plaintiff's verified declaration submitted in support of the opposition also alleges that defendant Ybarra failed to respond to his written complaint regarding the broken bed and returned his request unanswered. (ECF No. 50 at 31.)

Defendants make the same arguments for summary judgment for defendant Ybarra as to this claim as they made for defendant Atienza, i.e., plaintiff did not have a serious medical need for a medical bed and plaintiff's complaint was resolved shortly after he submitted his Health Care Appeal.

In her declaration, defendant Ybarra addresses plaintiff's claim regarding the broken bed as follows herein:

> 6. Mr. Young apparently complained that his medical bed was not functioning properly, in that Mr. Young was not able to raise the head of the bed. It appears that Mr. Young first expressed his complaint in Health Care Appeal No. HC15004306, which was submitted on October 23, 2015.
>
> 7. On November 7, 2015, Mr. Young apparently declared that he was going on a hunger strike until a new bed was provided. As indicated in the progress notes, I was advised of this. The notes further indicate that Mr. Young received a bed in working order later in the day on November 7, 2015.

(ECF No. 44-7 at 2.)

As discussed above, whether plaintiff had a serious medical need that required he have a medical bed is a disputed fact. Accordingly, defendant Ybarra is not entitled to summary judgment on grounds that plaintiff did not have a serious medical need for a medical bed.

Defendants next argue that defendant Ybarra did not act with deliberate indifference because plaintiff received a working medical bed shortly after she became aware of his hunger strike. However, defendant Ybarra's declaration does not state when defendant Ybarra first became aware of plaintiff's complaint regarding the broken bed. While defendant Ybarra states that she was advised of plaintiff's hunger strike on November 7, 2015, she does not state that this

was the first time she learned of plaintiff's broken bed.

While defendant Ybarra states that plaintiff first expressed his complaint regarding the broken bed in Appeal No. HC15004306, plaintiff alleges that he sent defendant Ybarra a written notice regarding the broken bed which she returned, unanswered.  Defendant Ybarra's declaration does not address this allegation.  Thus, whether defendant Ybarra ignored plaintiff's written notice regarding the broken bed is a materially disputed fact.

For the reasons discussed above, defendant Ybarra should be denied summary judgment

## VII.  Remaining Matters

### A.  Remaining Claim

Plaintiff's amended complaint includes a claim for injunctive relief to which no defendants are linked.  In particular, plaintiff seeks injections of Golimumab to treat pain and slow the advance of ankylosis spondylitis.  (ECF No. 5 at 10.)   Defendants' summary judgment motion does not address this claim.

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no affirmative link between the incidents of police misconduct and the adoption of any plan or policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

////

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert. denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of personal participation is insufficient).

Accordingly, to the extent plaintiff seeks money damages for his alleged failure to receive Golimumab, the undersigned recommends that this claim be dismissed as no defendants are linked to this claim.  See 28 U.S.C. § 1915(e)(2) (action may be dismissed at any time for failure to state claim upon which relief may be granted).  For the reasons discussed above, the related claim for injunctive relief should be dismissed as moot.

B. Defendant Clark

The undersigned ordered service of the amended complaint on defendant Clark.  (ECF No. 10.)  Service on defendant Clark was returned unexecuted.  (ECF No. 19.)  Accordingly, on April 12, 2017, the undersigned ordered plaintiff to resubmit forms for re-service of defendant Clark within sixty days.  (ECF No. 20.)  Sixty days passed and plaintiff did not return the forms.  Accordingly, for that reason, the undersigned recommends that defendant Clark be dismissed.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Plaintiff's claims for injunctive relief be dismissed;

2.  Defendant Clark be dismissed;

3.  Plaintiff's claim for damages for his alleged failure to receive injections of Golimumab be dismissed;

4.  Defendants' summary judgment motion (ECF No. 44), as it relates to plaintiff's claim for damages, be denied.

23

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 1, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Young2674.sj(3)

24